# CENTRAL BANK OF FREDERICK, and others, *vs.* GEORGE W. COPELAND, and MARY ANNE E. COPELAND, his wife.

The assignee of an interest in a mortgage, cannot claim in any other, or stronger light, than that of his assignor.

A contract obtained by fraud or duress, is void, and a contract to which one assents, through imposition, or overpowering intimidation, will be declared void, when sought to be enforced either in a court of law or equity.

A court of equity will consider all the circumstances, and refuse its aid against one, who, though apparently acting voluntarily, yet, in fact, executed the contract with a mind so subdued by harshness, cruelty, extreme distress, or apprehensions, short of legal duress, as to overpower and control the will.

The magistrate who took the acknowledgment of a married woman to a deed, is not, from considerations of public policy, if from no other, a competent witness to contradict, or impeach, his certificate of the acknowledgment.

But the acknowledgment of a *feme covert* to a deed or mortgage, may be impeached by competent and proper proof, in a case where the mortgagee, or his assignee, is seeking to enforce the mortgage as against the wife.

The obvious purpose of the Act of 1830, ch. 164, in prescribing the form of an acknowledgment for a married woman, was to guard her title to property against the improper efforts of her husband to wrest it from her, and not to bar, from judicial remedy, outrages, by which such an acknowledgment might be extorted.

All the declarations and acts, leading to, and inducing the execution of the deed, by a wife, are inadmissible in evidence as part of the *res gestæ*, in a case where the wife denies its validity, upon the ground, that she was forced to execute and acknowledge it by threats and menaces of her husband.

Where a wife appears to have been induced to execute and acknowledge a mortgage of her property for her husband's debts, by harshness and threats, and the exercise of unwarrantable authority, so excessive as to subjugate and control the freedom of her will, a court of equity will refuse to enforce it as against her.

The fact, that the mortgagee took no part in procuring the execution of the mortgage by the wife, does not strengthen his right to set it up as valid, nor impair hers to avoid it: the acceptance of a mortgage implies adoption, by the mortgagee, of the husband's agency in procuring it.

A mortgage, by husband and wife, of the wife's real estate, for the husband's

debts, though held void as to the wife, passes the husband's interest as tenant by the curtesy.

A decree *pro confesso*, passed on an order of publication, which directed publication thereof for three weeks, instead of one month, as required by the Act of 1842, ch. 229, is erroneous, and must be reversed.

APPEAL from the Equity side of the Circuit Court for Frederick county.

A mortgage was executed, February 25th, 1856, by George W. Copeland and Mary Ann E. Copeland, his wife, of a mill and mill-seat, *the real estate of the wife*, to Thomas and McPherson, to secure a debt for money paid and drafts accepted of $3900, *due by the husband* to the mortgagees. The acknowledgment and *separate examination of the wife*, appear duly *certified to* by the justice, in the usual form prescribed by the Act of 1830, ch. 164.

The mortgagees, subsequently, on the 10th of April 1856, conveyed the *mortgaged premises* to the Central Bank, by *way of mortgage*, and on the 29th of January 1857, they, and the bank, filed a bill for the sale of the mortgaged property, asking that the proceeds be applied first, to pay the debt due by the mortgagees to the bank, and the residue to the debt due them under the mortgage. Copeland, the husband, was a non-resident, and on an order of publication directed to be published, and published "once in each of *three* successive weeks," a decree *pro confesso*, was passed as against him.

Mrs. Copeland, under leave, filed a separate answer, in which she admits the execution and acknowledgment of the mortgage, but says she knew nothing of its purport save that it was intended to convey her property to secure her husband's debts, that she was confined to her bed at the time, by a very severe spell of sickness, and was ill and much reduced and weakened, and her nervous system shattered by disease, that the paper was presented to her whilst in this state, and she was forced to sign it in the presence of her husband by means of threats and menaces which she was unable to resist, and

that she never would have signed it, but for her weak, shattered and helpless situation and the threats used, and she charges that her signature and acknowledgment thereto, were obtained from her by undue means, threats and fraudulent devices, and that the same is void and not binding on her, and was never executed by her according to the requisition of the Act of Assembly.

*George W. Hays,* the justice who took the acknowledgment, called as a witness for the defendants, says, he believes the husband was present in the room when the mortgage was signed by his wife, when he went into the room she appeared to be asleep and very hard to rouse up, he does not know from what cause; B. A. Cunningham went into the room with him, and tried to rouse her by calling to her, she awoke and made an effort to rise, when her husband came in and assisted her to rise up in bed, she threw out her hand and told him to go away, upon which he stepped aside near the door, and she then wrote her name to the deed; after it was signed, they went out of the room for a moment, and witness remarked it was necessary for him to ask Mrs. Copeland a question apart from her husband, he then took the deed into the room, read the acknowledgment over to her, and requested her response, upon which she hesitated, and asked him what he said? he then read over the acknowledgment to her again and repeated his request, upon which she said, "I suppose I must say yes, and that it is my free will and without force," he thinks she slightly emphasized the word "must;" when he went into the room he pushed the door to, but did not fasten it, and about the time she made the last response as above, his attention was drawn to the door's moving, and he looked round and saw her husband standing in the door; he received a note in the morning from her husband stating she was sick, and requesting him to come to his house to take her acknowledgment, he was only in the room during the time spoken of above, he thought at the time she was slightly in a stupor, was induced to think so from her conduct, and supposed it proceeded from the medicine she had

taken, she appeared to be perfectly rational, and to understand what she was about, there was no one present except that her husband was standing in the door immediately after or at the time she answered, as above stated; does not know whether he was standing there at the time she answered or not, but his impression is, she had made the response before he discovered her husband's presence, he looked round as soon as he discovered a movement of the door.

*Dr. Jacob M. Thomas*, the attending physician of the wife, was called and attended her professionally on the day the mortgage was executed, between nine and ten o'clock, he found her in bed prostrated, physically, with quick pulse, hot dry skin, and debilitated, and very much disturbed in mind, she was in despair of ever obtaining any happiness or comfort in this life, on account of the course her husband was pursuing towards her, relative to the contemplated transfer of the mill-property to a creditor named McPherson; she seemed distracted in thought and reckless, and very much confused, he learned from herself and her husband, that the cause was the contemplated transfer of the property referred to, and the fear of being compelled to lose her home, he was satisfied she had taken laudanum about that time, from symptoms and confessions of the family; before he left she was laboring under the effects of laudanum, was sleepy and drowsy from the effects of it, and was becoming more so; from her symptoms he estimated the quantity taken to be from two to three drachms, amounting to two or three desert spoonsful, he does not think she was capable, on that occasion, of executing a valid deed or contract, or of transacting any business by the exercise of her own will and judgment, and this opinion of her mental condition he formed from his conversations with her then, and also from his knowledge of her before and at that time, and since, and her attempt to take her own life, and her expressed determination to do so, which she expressed to him then, when he first went into her room; her condition, he believes, resulted partly from the effects of the laudanum she had taken

and partly from distress of mind, consequent upon the contemplated transfer of the mill property. She objected to take any remedy, and took it unwillingly, she said she would rather die, and did not wish to live, and believing she was incapable of knowing what was for her own benefit, he administered the remedy himself—an emetic composed of ipecacuanha and tartar; he does not recollect the precise language she used, but his impression is, she told him she took the laudanum for the purpose of taking her life, or of preventing her from having any thing to do with the conveyance of the mill-property.

*Elizabeth Copeland,* a daughter, was at home at her father's house the morning the mortgage was executed, which was between ten and eleven o'clock; about a week or ten days before, she heard her father tell her mother, that if she did not sign the mortgage, he would destroy the property by fire; he was very angry, and spoke in an abrupt manner; her mother was in a very weak state the morning the mortgage was executed.

*Mary Jane Copeland,* another daughter, was also at home the morning the mortgage was executed, which was shortly before eleven o'clock; about a week or ten days before, she also heard her father tell her mother, that if she refused to sign the mortgage, he would destroy the property by fire; and on that morning she heard her father and mother conversing, and he told her she must sign the mortgage if it was the last thing she did on earth, he was very angry when he spoke it and spoke in a very abrupt manner; her mother was very weak that morning, and had taken laudanum before Dr. Thomas came, witness saw her take it, about half a teaspoonful, whether she had taken any before or not, witness does not know, but knows she took none afterwards; her mother had been sick during the summer and winter, and had been taking medicine during that time, she had taken laudanum before, during her sickness, but not so much at one time as she took that morning.

*Alex. Maxwell,* saw Mrs. Copeland between eight and nine

and nine o'clock, on the morning of the day the mortgage was executed, she appeared to be in a high state of excitement; by invitation of her husband he went to her room, being intimate with the family, and when he approached her he asked her what was the matter, and she said she had more trouble than she could bear; her husband was present, and she requested witness to take that man out of the room, (referring to her husband,) and also requested witness to leave, and both of them immediately left the room; it was very unusual for her to treat witness in that way—she had never treated him so before; from that conduct, and the high state of excitement under which she was laboring, witness formed the opinion she was incapable of transacting any legal business upon that occasion.

It was proved that neither McPherson, nor Thomas, nor any person representing the Central bank, was present at any time during the day the mortgage was executed; nor when the threat, testified to by the witnesses, to destroy the property by fire, was made. It was admitted that Copeland, the husband, resided in Frederick county till the summer or fall of 1857, when he left the State, and has not since returned, but has been residing in the western States—at one time in Iowa. Exceptions to the admissibility of the testimony of all the witnesses, were filed by the complainants, upon grounds sufficiently indicated in the opinion of this court. The court below (NELSON, J.) passed a decree dismissing the bill, from which the complainants appealed.

The cause was argued before BARTOL, GOLDSBOROUGH and COCHRAN, J.

*Jno. P. Poe* and *A. Randall,* for the appellants.

1st. The testimony of the justice was clearly inadmissible. He was called to discredit his official act—an act which the law required him to do—and to permit him to impeach it or to gainsay its entire accuracy, would be to inaugurate a rule of

evidence, whose effect would be to overturn the well settled principle that guards written instruments from contradiction by parol, break down the barriers which the law has wisely thrown around judicial records, and place titles to real estate, at the mercy of every corrupt magistrate. Even if the certificate be not conclusive in the absence of fraud in the officer making it, still he is estopped from denying the truth of all its averments. Other testimony, besides that of the justice, must be produced before any court would vacate a deed for fraud or force, in its execution. 11 *Leigh*, 294, *Harkins vs. Forsyth.*

2nd. But the truth of the facts stated in the certificate of the justice, cannot be questioned or impeached, by parol evidence, in any proceeding to which he is not a party, or, at least, in which he is not charged with fraud or something equivalent in law to fraud. The law constitutes him the judicial officer, by whom alone the record shall be made of certain facts necessary to the due transmission of titles, and it would obviously frustrate the very purposes designed to be subserved by the law, if his certificate were not invested with absolute conclusiveness in all cases, except where he, himself, is charged with fraud or corruption in the performance of his duty. The case of *Bissett vs. Bissett*. 1 *H. & McH.*, 211, is *precisely similar* to this, and it was there held, that no evidence could be received to invalidate an acknowledgment of a deed. See, also, 3 *H. & McH.*, 321, *Ridgely vs. Howard*. 12 *G. & J.*, 455, *Miles vs Knott*. 44 *Maine*, 28, *Greene vs. Godfrey*. 26 *Verm.*, 500, *Eastman vs. Waterman*. 13 *Barb.*, 50, *Elwood vs. Klock*. 6 *Blackf.*, 393, *McNeely vs. Rucker*. 26 *Eng. Law & Eq. Rep.*, 516, *Bancks vs. Ollerton*. The cases, which seem to hold a contrary doctrine, will be found, on examination, to be cases, for the most part, where the evidence offered is designed to supply proof of facts necessary to give validity to the acknowledgment, but omitted to be set forth in it, such as proof of the official character of the persons taking it, or the county in which it is taken, or to correct a misstatement of facts *not required* by law to be set forth, such as where the acknowl-

edgment, contrary to the fact, states the residence of the party to be in a different county from that of the justice taking it. In such cases parol evidence is admissible, for its operation is, not to contradict the official act, in any particular essential to the title, or preliminary to recording, but simply to prevent the deed from failing, by reason of an erroneous statement of a fact not required to be mentioned, or by the inadvertent omission of the justice to state his official character. 2 *Gill*, 160, *Byer, et al., vs. Etnyre, et al.* 6 *H. & J.*, 141, *Connelly vs. Bowie.* But no case can be found in Maryland, where parol evidence was admitted to contradict, and overthrow, a recital in the acknowledgment of a fact required by law to be made. We insist, therefore, that all the evidence in this case, designed to alter, vary, contradict and overthrow the certificate of the justice, is inadmissible.

3rd. But the mortgagees were *bona fide* purchasers, and are not shown to have had any agency or complicity in, or even knowledge of, any harsh treatment, nor indeed of any circumstances sufficient to put them on inquiry. The Pennsylvania cases, cited on the other side, are clear to the point, that notice of the fraud must be brought home to the knowledge of the grantee and parties claiming under the deed: they are all cases where the party seeking to use the deed was *particeps criminis*. See, also, 6 *Texas*, 208, *Hartley vs. Frosh.* But even if they are not entitled to avail themselves of the defence of *bona fide purchasers*, without notice, because of the husband's being their agent, still, this objection does not apply to the *bank*, which advanced its money to the mortgagees, *upon the faith of a mortgage* of the mortgaged premises. If a fraudulent grantee conveys to a *bona fide* purchaser, without notice of the fraud or other infirmity, such purchaser's title will be good even as against the original grantor, and especially where the latter is guilty of *laches*, negligence, or other conduct, by which the original grantee is enabled so to transfer his title. 8 *Md. Rep.*, 251, *McClellan vs. Kennedy.* 9 *Md. Rep.*, 508, *Campbell vs. Lowe.*

4th. The defect in the acknowledgment, if any existed, is cured by the various curing Acts, and especially by that of 1858, ch. 208. Indeed, the Act of 1856, ch. 154, sec. 90, passed a short time after this deed was executed, abolished the vain and idle ceremony of a separate acknowledgment by, and the private examination of, the wife, and this provision of this Act has been embodied in the Code, Art. 24, sec. 69.

5th. All such parts of the testimony which details the declarations of the wife *before* the execution of the mortgage, and out of the presence of the appellants, form no part of the *res gestæ*, and are not admissible in evidence.

6th. But if all the witnesses are competent, and all the evidence is admissible, and as against all the parties to this case, it is not sufficient to establish the defences set up by the appellee. The presumption of law is in favor of the validity of the deed, and the proof of threats, fraud, or want of capacity, must be *clear* and *convincing*. The evidence here, on careful examination, will be found so conflicting, inconsistent, contradictory, irreconcilable, and unworthy of credit, especially that of the justice, as to furnish no basis upon which the court can safely rely.

7th. The decree, *pro confesso*, against the husband, cures the defect, if any, in the order of publication. 3 *G. & J.*, 413, *Robinson vs. Townshend*. 10 *G. & J.*, 65, *Gibson vs. McCormick*. 10 *G. & J.*, 489, *Luckett vs. White*. 4 *Gill*, 333, *Dawes vs. Thomas*.

8th. The husband is tenant by the curtesy, and as he does not controvert the deed, and as the case is established as against him, a decree should be passed for a sale, at least of his interest as such tenant, to pay the mortgage debt. *Act of* 1842, *ch.* 293. 8 *Md. Rep.*, 427, *Anderson vs. Tydings*. 8 *Md. Rep.*, 461, *Logan vs. McGill*. 4 *Md. Ch. Dec.*, 283, *Hall vs. Hall*.

*Grayson Eichelberger* and *Thos. Donaldson*, for the appellees.

1st. That any deed may be set aside, or the enforcement of its terms successfully resisted on the ground of fraud or imposition, when the deed is itself the subject of litigation in a court of equity, is a principle too well settled, and too familiar to need the citation of authorities. That the facts in this case establish clearly, that the wife was induced by influences which equity declares to be fraudulent, to sign and acknowledge this mortgage, is indisputable, if the evidence was admissible. The same evidence also establishes her want of capacity at the date of its execution. It is objected, that all the testimony to facts not immediately accompanying and taking place on the very day of the execution of the mortgage, should be excluded as forming no part of the *res gestæ*, but the position is untenable. The law does not restrict the introduction of evidence as part of the *res gestæ*, to any particular limits of time; but if facts offered in evidence are so connected with the main fact under consideration, as to illustrate its character, they are admissible. 1 *Greenl. Ev.,* sec. 108. 5 *Md. Rep.*, 450, *Handy vs. Johnson.* 6 *Md. Rep.*, 319, *McDowell vs. Goldsmith.* 2 *Hill*, 257, *note b.* Here the main fact is the condition of the wife's mind on the day the mortgage was executed, and this can best be understood by showing the treatment to which she had been subjected by her husband previously to that date, and her conduct just before and after, as well as at the time of the execution of the mortgage. If the signing and acknowledging of this mortgage by her, were the result even of a long continued course of action on the part of her husband, all facts showing such a course of action were properly received in evidence. Although in regard to a deed, not itself the subject of the suit, but offered in evidence collaterally, the justice might not be heard to contradict his own certificate, the case is otherwise when fraud in its execution is charged in a proceeding in equity, based upon the deed itself, and if he is not competent to do so, still its execution and acknowledgment may be assailed by other competent proof. Otherwise the whole purpose of the Act of Assembly requiring

certain guards for the protection of a married woman, in regard to her rights of property, would be defeated, and a dishonest magistrate, by a false certificate, might in any case rob her of her rights, and deprive her of all remedy. 2 *Gill*, 150, *Byer, et al., vs. Etnyre.* 9 *Penn. State Rep.*, 14, *Schrader vs. Decker.* 16 *Penn. State Rep.*, 532, *Louden vs. Blythe.* 27 *Penn. State Rep.*, 22, *Louden vs. Blythe.* 11 *Md. Rep.*, 465, *Johns vs. Reardon.* But it is said this acknowledgment is cured by certain Acts of Assembly. Of these none have any application to a deed executed at the date of this mortgage, except that of 1858, ch. 208, and that refers only to the *form* of the acknowledgment and certificate, and not to the substantial requirements of the law for the protection of the rights of married women. Indeed, the form of the acknowledgment in the present case is strictly correct, but it states what is proved to be false as matter of fact. Again, this Act of 1858 was passed after this bill was filed, and the Legislature had no power to pass a law affecting the interest of parties in litigation: such a law invades the province of the judiciary. 1 *G. & J.*, 463, *Crane vs. Meginnis.* But the fact that the wife was without capacity to contract, is *independent* of the law relating to the acknowledgment of a married woman; and the deed is void upon the general ground of fraud and incapacity to make a valid contract. Fraud may be proved by facts and circumstances, and any fact, however trivial, having a tendency to prove it, is evidence on such an issue, and when proved, fraud vitiates every instrument.

2nd. The mortgage, for the reasons stated, being void as to the interest of the wife, it can have no validity as to her interest, into whosesoever hands it is attempted to be conveyed; and even a *bona fide* purchaser for value, is not protected as against her. The purchaser of an equitable title takes subject to all the equities affecting the property. 2 *White & Tudor's Lead. Cases*, 233, 419, 420, 445. 11 *Paige*, 467, *Ellis vs. Messervie.* But these mortgagees were not *bona fide* purchasers in any sense. The mortgage was taken to secure a prexisting

debt, and nothing was advanced, or at any time paid, in consideration of its execution. Nor are they in a worse condition than they would have been if they had known, on the day of its execution, that the wife was about to sign and acknowledge this mortgage under the influence of overwhelming intimidation. Again, the husband was their agent in obtaining the mortgage, they avail themselves of the fruits of their agent's acts in accepting it. Neither is the bank a *bona fide* purchaser, even if it has any standing in court in this case. By the deed of the mortgagees, they mortgaged to the bank their interest, whatever it was, and there is no affidavit of any officer of the bank as to the *bona fides* of the consideration. Neither Copeland nor his wife were parties to the mortgage of the mortgage, nor do they claim under them, but adversely to them all. 4 *Paige*, 215, *Dickerson vs. Tillinghast*. 1 *Smedes & Mar. Ch. Rep.*, 45, *Rowan vs. Adams*. 1 *Hopkins' Ch. Rep.*, 569, *Van Rensselaer vs. Stafford*. 3 *Story's C. C. Rep.*, 365, *Morse vs. Godfrey*. Besides, as the debt due by Copeland to the mortgagees, and to secure which the mortgage was given, was not transferred to the bank, the conveyance of the mortgaged real estate itself to the bank, could not be valid in equity, as the mortgage is merely appurtenant to the debt secured by it. 6 *G. & J.*, 498, *Pratt vs. Vanwyck*.

3rd. The order of publication against Copeland was defective, in requiring publication for three weeks instead of one month. *Act of* 1842, *ch.* 229. The decree *pro confesso* was therefore improperly signed, and all the subsequent proceedings were of no effect, as against Copeland himself.

COCHRAN, J., delivered the opinion of this court.

The proceedings upon which this appeal was taken, were had upon a bill filed to obtain a decree for the sale of property belonging to Mary Ann E. Copeland, described in the mortgage executed by her husband, George W. Copeland, and herself, to secure the payment of an antecedent debt due from him to McPherson and Thomas. The answer of Mrs. Cope-

Central Bank of Frederick, *et al.*, *vs.* Copeland & Wife.

land, although admitting the execution and acknowledgment of the mortgage, puts its validity in issue, on the ground, that she was forced to execute and acknowledge it by threats and menaces, which, from feeble health and a shattered nervous system, she was unable to resist; and the leading question presented is, whether the mortgage is voidable by her on the ground stated in the answer? The conveyance from McPherson and Thomas to the Central Bank, through which it claims in this case, if effective for any purpose, can only operate as an assignment of an interest in the mortgage executed to them, and under that instrument, considered as an assignment, the bank, as an assignee, will not be permitted to claim in any other or stronger right than that of the assignors. In this view of the existing relationship of the appellants, the question presented may be determined as one raised between the immediate parties to the mortgage.

The element of obligation upon which a contract may be enforced, springs primarily from the unrestrained mutual assent of the contracting parties, and where the assent of one to a contract is constrained and involuntary, he will not be held obligated or bound by it. A contract, the execution of which is induced by fraud, is void, and a stronger character cannot reasonably be assigned to one, the execution of which is obtained by duress. Artifice and force differ only as modes of obtaining the assent of a contracting party, and a contract to which one assents through imposition or overpowering intimidation, will be declared void, on an appeal to either a court of law or equity to enforce it. The question, whether one executes a contract or deed with a mind and will sufficiently free to make the act binding, is often difficult to determine, but for that purpose a court of equity, unrestrained by the more technical rules which govern courts of law in that respect, will consider all the circumstances from which rational inferences may be drawn, and will refuse its aid against one who, although apparently acting voluntarily, yet, in fact, appears to have executed a contract, with a mind so subdued by harshness,

cruelty, extreme distress, or apprehensions short of legal duress, as to overpower and control the will. 16 *Ves.*, 156. 1 *Ves. Jr.*, 22. 9 *Penn.*, 14. 27 *Penn.*, 22. 11 *Mass.*, 368. 13 *Mass.*, 371. 1 *Story Eq.*, secs. 239, 240, 243.

As the validity of this mortgage must, therefore, depend on the fact of its execution and acknowledgment by Mrs. Copeland, as her own free and voluntary act, we proceed to consider the evidence contained in the record, by which its character in that respect may be determined. In our opinion the testimony of Hays, taken to contradict or impeach his certificate of Mrs. Copeland's acknowledgment of the mortgage, was not admissible. That the statements contained in the certificate, under the circumstances, and as between the parties in the case, were open to contradiction by proper and competent proof, cannot be doubted, but it does not follow, that a public officer, after the performance of an act required by law, should be permitted to defeat its effect by impeaching his official certificate of the manner in which he performed it. From considerations of public policy, if from no other, he must be held an incompetent witness for such a purpose. *Harkins vs. Forsyth*, 11 *Leigh.*, 294.

The objection taken to the admission of the other witnesses, at least so far as their testimony is of declarations and acts leading to, and inducing the execution of the mortgage, we think cannot be maintained, and that, as such declarations and acts must be considered as a part of the *res gestæ*, their testimony, to that extent, was properly admitted. From the portion of the evidence to be considered in that connection, it appears that Mrs. Copeland had been, and was, at the time of executing the mortgage, much enfeebled in health, and suffering nervous and mental depression, caused in part by the harsh conduct of her husband in reference to the proposed transfer of her property, and that her mind was so distracted, confused and reckless, as to induce the belief on the part of her attending physician, that she was incapable of making a valid deed or contract. The execution of the mortgage was

preceded by personal menaces and threats of her husband to destroy the property by fire, if she did not execute it, and the fact that it was executed and acknowledged involuntarily, as a consequence, cannot be doubted. The resort to measures thus violent and harsh, leads irresistibly to the conclusion, that her consent could not have been obtained otherwise. Her acknowledgment, that it was free and voluntary, and not induced by fear, as between the parties to the deed, is not conclusive of the fact that it was so; nor can it, with due regard to the evidence in the case, be so considered. The obvious purpose of the Act of 1830, ch. 164, in prescribing this form of acknowledgment, was, to guard the wife's title to property against the improper efforts of a husband to wrest it from her, and not to bar from judical remedy, outrages, by which such an acknowledgment might be extorted. A husband, who, by extreme harshness, compels a wife to execute a deed of her property against her will, and then, in the form prescribed by law for her protection, to sanction the wrong inflicted by acknowledging its involuntary execution to be voluntary and without fear, cannot, by reason of the mere formal acknowledgment, entitle himself, nor any one in whose interest such a wrong may be attempted, to set up, and claim upon the deed, as a valid conveyance. As the execution and acknowledgment of the mortgage in this case, by Mrs. Copeland, appears to have been induced by harshness and threats, and the exercise of an unwarrantable authority, so excessive as to subjugate and control the freedom of her will, the aid of this court to support and enforce its provisions against her, must be refused. The case of *Bissett vs. Bissett*, 1 *H. & McH.*, 211, referred to in the argument of this case, is so imperfectly reported, that it cannot be relied on as an authority upon this question, but if its import be, to make the acknowledgment of a deed, by a wife under duress, conclusive and binding on her in all cases, we think it should not now be regarded as establishing a principle by which this case should be governed.

The fact that McPherson and Thomas, personally, took no

active part in procuring the execution of the mortgage by Mrs. Copeland, does not strengthen their right to set it up as a valid deed, nor does it impair her right to avoid it. Its execution was procured by the husband, acting in their interest and for their benefit, and as their acceptance of the mortgage implies an adoption of his agency, they can have no right to enforce it, free from infirmities originating in this use of unconscionable means to compel its execution.

The only interest, therefore, upon which the mortgage can be held to operate, is that of the husband as tenant by the curtesy. To that extent its validity was admitted in the argument of the case, although it was contended, on the part of the appellees, that the decree taking the bill *pro confesso*, was not authorized by the terms of the order of publication, notice of which appears to have been published, as directed, for three weeks instead of one month, as required by the Act of 1842 ch. 229. We think the decree was open to the objection taken, and that it should, for that reason, be reversed.

In accordance with these views, the court will sign a decree reversing the decrees of the court below, dismissing the bill against Mrs. Copeland with costs, and remanding the cause for such further proceedings against George W. Copeland, as may be necessary for the final determination of the appellants' proper rights and claims.

*Decree reversed and bill dismissed.*

(Decided June 3rd, 1862.)